Arthur Bernstein and Grace Bernstein v. Commissioner.
Bernstein v. Commissioner
Docket No. 76315.
United States Tax Court
T.C. Memo 1960-213; 1960 Tax Ct. Memo LEXIS 78; 19 T.C.M. (CCH) 1187; T.C.M. (RIA) 60213; October 7, 1960
*78 Petitioner is a practicing physician and has been engaged in the practice of medicine continuously since 1937 both as an individual and in partnership with other doctors. In 1946, petitioner joined with other doctors in a plan to engage in a group practice as a clinical group. On advice of counsel, a corporation was organized the only purpose of which was to own the building where the group would engage in practice and the equipment it would use. The doctors formed a partnership in which petitioner became a partner. Some of the doctors, including petitioner, who owned medical equipment, sold the equipment to the corporation. The corporation rented the building and the equipment to the partnership. The partners used the equipment in their group practice. The corporation gave petitioner notes for his equipment. The group practice was not successful. In 1955, the notes held by petitioner became worthless. Held, petitioner sustained a loss from a business bad debt deductible in full in the year of the loss. Joseph M. Nolan, Esq., 60 Park Place, Newark, N.J., for the petitioners. Arthur Pelikow, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined a deficiency in income tax for the taxable year 1955 in the amount of $4,186.62. The question for decision is whether a loss sustained in 1955 was a loss from a business bad debt under section 166(a)(1), 1954 Code, or a loss from a nonbusiness bad debt within section 166(d)(2). Findings of Fact The stipulated facts are found as stipulated. The petitioners are *80 residents of Millburn, New Jersey. They filed a joint return with the district director of internal revenue for the district of New Jersey. Arthur Bernstein is a physician. He received his license to practice medicine from the State of New Jersey in 1937. Since the issue relates only to him, he is referred to hereinafter as the petitioner. Petitioner has been engaged in the practice of medicine in New Jersey since 1937. Prior to 1940, he engaged in the general practice of medicine. Since 1940, he has specialized in internal medicine and cardiovascular diseases. Petitioner's business is the practice of medicine. In the conduct of his business he uses the general equipment ordinarily used in a doctor's office. During the years 1937-1946, petitioner carried on his medical practice as a sole practitioner. Beginning in 1940, his office was located at 668 Clinton Avenue, Newark, New Jersey, and at that time his office consisted of 7 rooms including a laboratory. He then owned equipment which he used in his business. The equipment was subject to depreciation. Early in 1946, petitioner considered the possibilities of engaging in the group practice of medicine in Newark in partnership *81 with others. The group practice of medicine brings together specialists in several branches of medicine who are located in one place which is operated as a group clinic. Under such plan, each physician is able to carry on a specialized practice; patients can conveniently consult specialists and surgeons within the group; and the doctors' fees and expenses are handled on a partnership basis. Petitioner and nine other physicians entered into a partnership agreement on October 3, 1946, after concluding several preliminary arrangements which are referred to hereinafter. They agreed to carry on the practice of medicine and surgery as a group under the name of "The Newark Clinical Group." The partnership continued in existence until December 1, 1952. Petitioner withdrew from the partnership on July 31, 1952. He then returned to private practice and formed a partnership with another doctor, Franklin Simon, at the location of his old office at 668 Clinton Avenue. During the time that petitioner was a member of the group practice partnership, his practice was confined to the group arrangements and his office was in the group's offices. Prior to October 3, 1946, petitioner and several *82 other physicians and surgeons undertook preliminary arrangements for establishing a group practice, which involved the purchase of a building for a clinic. They obtained financial and legal advice. Their lawyer advised them to organize a New Jersey corporation to own the building and equipment which the group would rent from the corporation. The corporation was organized on February 15, 1946, under the name of "Medical Specialists' Building Corporation," which is referred to hereinafter as the corporation. Included in the authorized powers of the corporation which were stated in the certificate of incorporation were the following: "To provide, manage, and operate buildings, clinical facilities, dispensaries, hospitals, equipment and other facilities for lease or rent to physicians for their practice of the medical arts, including all medical, surgical, mental and dental sciences." The stock which was authorized in the certificate of incorporation was 1,000 shares of no par value common stock. On November 26, 1946, the certificate of incorporation was amended to provide that the authorized stock would consist of 500 shares of Class A voting stock, and 500 shares of Class B nonvoting *83 stock, both without par value. Petitioner acquired 10 shares of Class A voting stock in the corporation for which he paid $1,000. There were issued to others in the group, 90 shares of stock for which they paid $9,000. Altogether, 100 shares of stock were issued for $10,000. The issued stock consisted of $6,000 of Class A stock and $4,000 of Class B stock. The corporation issued 20-year, 4 per cent bonds in the total face amount of $121,500. The bonds were purchased by those who owned stock in the corporation, and by their wives. Petitioner and his wife bought bonds in the amount of $14,500. The corporation purchased a piece of property for $35,000 on which was located an old, large family mansion, and proceeded to remodel the building to provide about 30 rooms to serve the needs of the medical group to whom the building was to be rented. The total cost of the remodeled building was in excess of $200,000. Of this amount, about $90,000 was obtained by giving a mortgage to an insurance company. The address of the building was 89 Lincoln Park, Newark, New Jersey. The articles of co-partnership of The Newark Clinical Group, hereinafter called the Group, provided inter alia, as *84 follows: That each party shall devote all of his time and attention to the affairs of the Group; and that all monies collected for any professional services rendered be turned in to the partnership bank account provided, however, that the partnership shall be entitled to perform professional services for any partner, or for any member of his immediate family, or any specific patient or group of patients as may be decided upon by a majority of the Board of Governors from time to time, without any charge being made therefor by the partnership. That the charge or charges for any and all services rended [render] by the partnership, or any member thereof to any person, firm, association or corporation, shall be fixed by the Board of Governors or if they shall be unable to agree, by a majority thereof. Petitioner's contribution to the capital of the partnership was $4,000, of which he paid $500 in cash. The balance was paid out of his share of profits. The petitioner and certain other members of the Group sold, respectively, his office medical equipment to the corporation. On February 28, 1947, the petitioner sold his office medical equipment to the corporation. Petitioner's equipment *85 was appraised at its depreciated value at that time. The corporation agreed to pay petitioner the appraised value but did not have the cash to make the payment. Instead, the corporation gave petitioner 2 notes bearing 6 per cent interest, dated February 27, 1947, payable 10 years thereafter. Interest on the notes was to begin on February 28, 1948, and was to be paid annually thereafter. The parties have stipulated that the amount due petitioner on the notes in 1955 totaled $7,780.15. The corporation paid petitioner interest on the notes until about 1950. The group partnership paid rent to the corporation for the use of the building and equipment located therein. As a member of the group, the petitioner practiced medicine. However, all fees and receipts were commingled and all expenses were combined, and petitioner shared in the profits and losses in accordance with the terms of the partnership agreement. Immediately after the partnership was terminated on December 1, 1952, the corporation offered the property where the group had been located for sale, but it was not sold until 1955. The corporation's liabilities exceeded the amount obtained in the sales of all of its assets and *86 petitioner received only $1,151.67 in 1955. He applied that amount to the notes for the sums owed by the corporation for its purchase of petitioner's medical office equipment leaving an unpaid balance of $6,628.48. The parties are agreed that the notes of the corporation became worthless in 1955 and that petitioner's loss was $6,628.45. In his return for 1955, petitioner reported the loss sustained on the corporation's notes as a loss from a business bad debt in the amount of $7,628.48, and he deducted the entire amount in Schedule C of the return. The petitioner now agrees that he overstated the amount of the loss by $1,000. When petitioner withdrew from the partnership, he did not and could not take back any of the medical office equipment which he had sold to the corporation in February 1947. Petitioner was obliged to purchase other office medical equipment when he returned to the private practice of medicine after July 31, 1952. Respondent determined that the loss on the corporation's notes was a loss from a nonbusiness bad debt deductible as a short-term capital loss. However, because petitioner had been allowed a deduction of $1,000 due to long-term capital losses from *87 sales of stock and the worthlessness of the stock in and the bonds of the Medical Specialists' Building Corporation, no additional deduction was allowable for the loss on the corporation's equipment notes, and the entire amount of that loss was disallowed. The indebtedness of Medical Specialists' Building Corporation to the petitioner was a business debt, the loss from which in 1955 was proximately related to petitioner's business both when the debt arose and when it became worthless. Opinion The only question to be decided is whether petitioner's sale in 1947 to the corporation involved of the office medical equipment which he had used in his individual practice of medicine gave rise to a business debt or a nonbusiness debt within the definition stated in section 166(d)(2) of the 1954 Code. [1] It is agreed that there was a debt owing by the corporation to the petitioner for which it gave its notes; that the balance due on the notes and the amount of petitioner's loss was $6,628.48; and that the debt became worthless in 1955. *88 The chief contention of the respondent is that the single transaction of selling medical office equipment to the corporation did not constitute for the petitioner a transaction carried out in the ordinary course of his conduct of a business involving the purchase and sale of medical office equipment, and, therefore, the loss from the bad debt in question did not arise in the course of carrying on such business. Respondent argues that "it was not essential that the petitioner sell his equipment to the corporation." He relies principally upon Edward Koppelman, 27 T.C. 382; and he cites Jan G. J. Boissevain, 17 T.C. 325; A. Kingley Ferguson, 16 T.C. 1248; and related cases in support of his position. The petitioner does not contend that he was regularly engaged in a business involving selling medical office equipment. Neither does he contend that the loss was one sustained in any usual transaction of a kind which either he, as an individual physician engaged in the practice of medicine, or a group medical practice partnership ordinarily transacts. Petitioner contends, however, that the debt due him and the consequent loss was proximately and *89 directly related to his trade or business, the business of being a practicing physician, both at the time the debt arose and at the time it became worthless. He argues that without doubt the use of medical equipment is an integral part of the practice of medicine, and that under the facts and circumstances of the instant case the sale of his equipment to the corporation and the eventual loss sustained was proximately related to and connected with his business. Petitioner relies chiefly upon Robert Cluett, 3rd, 8 T.C. 1178; Tony Martin, 25 T.C. 94; and J. T. Dorminey, 26 T.C. 940. The question whether a debt is a business debt or a nonbusiness debt is essentially a question of fact in each case. J. T. Dorminey, supra. See also section 1.166-5, Income Tax Regulations.[2] The Commissioner's regulation provides, in part, as follows: For purposes of subparagraph (2) of this paragraph, the character of the debt is to be determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of *90 the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception provided by that subparagraph. The debt in question was not the result of a loan by the petitioner. Rather, the petitioner made a bona fide sale in 1947 of the medical equipment which he had been using in his individual practice of medicine, which constituted his business. He continued in the practice of medicine throughout the succeeding years, including 1955, and he is still engaged in that practice. However, beginning in 1946 and until the middle of 1952, the petitioner carried on his professional business as a member of a group practice partnership. When he withdrew from that partnership, he entered into another partnership with one physician and under that arrangement he carried on an individual practice, which was the way he carried on his business in 1955 when the debt became worthless. Petitioner at all times carried on the practice of medicine, as such, which is his business. From 1937 to 1946 he employed the business entity form of a sole proprietorship; from 1946 to 1952 he employed the business *91 entity form of a partnership. Although the form of business entity changed, the petitioner still carried on the same business, the practice of medicine. The sale by the petitioner of his medical equipment to the Medical Specialists' Building Corporation and his acceptance of its notes for the purchase price had an essential relationship to his conduct of his business in partnership with other physicians. Our conclusion is that the bad debt arising from petitioner's loss on the notes constituted a business bad debt, and that the petitioner is entitled to a deduction for the full amount of the loss. There were 5 doctors who became the members of the original group; all were specialists, and each was a medical doctor who practiced a recognized medical specialty. In 1946 the group organized the Medical Specialists' Building Corporation, and they also entered into a partnership to conduct a group practice. The corporation was formed, on advice of counsel, for the purpose of acquiring a building for the use of the partnership and medical equipment necessary for the group's use. It is not urged by the petitioner that by virtue of the group association and the formation of the corporation, *92 the petitioner or other member doctors became something other than practicing physicians. It is evident that each doctor continued to engage in the practice of medicine. The nature of their business did not change; only the form of each doctor's business changed. Where previously each was a sole practitioner, after the formation of the group each was part of a professional partnership which functioned as a unified whole. They practiced in a building and used equipment leased to the group as a whole. In order to secure the necessary equipment for the group, it was necessary that the various members sell their individual equipment either to the partnership or to the corporation. On advice of counsel, the group had decided to form a corporation for the purpose of holding title to all of the property to be used. Therefore, various members, including the petitioner, sold their equipment to the corporation and each received the corporation's notes. The group and its members, thus, had available the equipment that was essential to the group operation and its ultimate success. We think it does not make any real difference, under the issue, that the equipment was sold to the corporation rather *93 than to the partnership. The facts show and the petitioner concedes that he was not in the business of financing corporations. Under the facts, the corporation was a necessary adjunct if petitioner and his colleagues were to successfully practice group medicine. The petitioner turned over his medical equipment so that the corporation would have equipment which, in turn, would be made available to the partnership. Without the corporation and the equipment which it leased to the group, the petitioner would not have been able to practice medicine in the group. Turning over the equipment to the corporation and the corporation's debt were closely related to the medical-practice business of the petitioner. Cf. Harding v. United States, 113 F. Supp. 461. The case of Robert Cluett, 3rd, 8 T.C. 1178, is similar in principle to the instant case. In Cluett the taxpayer was a member of the Stock Exchange. The membership of the Exchange was increased by one-fourth, each member being given the right to transfer his proportionate share. The taxpayer sold his share to Lowell. Lowell became bankrupt and the balance of the indebtedness became worthless. The respondent contended *94 that the taxpayer was not in the business of buying and selling stock exchange seats and therefore the loss did not constitute a business bad debt. Cluett, however, did not claim that he was engaged in the business of buying and selling stock exchange memberships, but he contended that his business was the buying and selling of shares of stocks, to which business the ownership of stock exchange membership is an integral part. It followed of necessity that the acquisition or disposal of such membership, consistent with the requirements and needs of his business, was essentially related to his trade or business. In ruling that the loss was a business bad debt, this Court said: "The debt here in question was not the result of a loan by the petitioner to a friend or relative or an isolated transaction which has no relation whatever to the business in which he was engaged, but, on the contrary was closely related to the business of owning and using a stock exchange membership for the production of income, in which business the petitioner was engaged not only in 1929, when the debt was created, but also in 1943, when it became worthless. This business of the petitioner and that of the *95 partnerships to which he belonged were not necessarily identical or coextensive for the purpose of section 23(k)(4). His membership in the Exchange was one of the principal tools with which the petitioner conducted his business at all times material thereto. It was one of the important assets which he brought to the firms of which he became a member. He, alone, could use that seat to conduct business of those firms or for those firms on the floor of the Exchange. He did use his membership for that purpose. He had bought it for that purpose. "There was an accretion of one-fourth to that membership in 1929 and his sale of that one-fourth resulted in the debt. That debt arose in the course of the petitioner's business, which involved owning the Exchange membership, which in turn required a sale of accetion in order to realize any benefit thereon. "Thus, the debt, at all times material hereto, bore a proximate relation to the business of the petitioner and the loss from its worthlessness also bore a proximate relationship to the business." Similarly, in the instant case, petitioner is a practicing medical specialist and it is essential that he have available the equipment necessarily *96 used in the course of that business, in which the use of medical equipment is an integral part. When petitioner and his colleagues decided to form a partnership, the need for equipment did not become less essential. It remained an essential element of the successful practice of medicine. Rather than practicing individually, it was thought better that a partnership should be formed and it then became necessary to provide the group with equipment. For that purpose, the corporation was formed, the principal object of which was To establish, provide, manage and operate buildings, clinical facilities, dispensaries, hospitals, equipment and other facilities for lease or rent to physicians for their practice of medical arts, including all medical, surgical, mental and dental sciences. In Commissioner v. Stoke's Estate, 200 F. 2d 637, affirming a Memorandum Opinion of this Court, petitioner was engaged in the business of exploiting patents. It was held that a loss incurred by the petitioner on an advance to a corporation which he formed to promote a certain patent was incurred in the taxpayer's trade or business. The evidence established that his activities involved much more *97 than the mere investment of funds and management of corporations. The facts in Tony Martin, 25 T.C. 94, are similar to the present case. There the petitioner advanced funds to a corporation organized to produce a motion picture in which the petitioner was to star. When the loans became worthless he claimed a business bad debt deduction. It was conceded that Martin was merely an entertainer and that he was not in the business of promoting motion pictures in corporate form or otherwise. We held that the debt was a business bad debt. Here, petitioner's transfer of medical equipment and his receipt of notes in payment from the corporation was, as in the Martin case, directly related to the carrying on of petitioner's profession. In the Martin case, the corporation was to produce a film. It was apparent that the production of a popular film would directly relate to the promotion of the business of the taxpayer, e.g., being an entertainer. In this case, the corporation was to hold title to the property and medical equipment which was essential to the successful practice of the petitioner's calling and that of his partners, the practice of medicine. In J. T. Dorminey, supra, *98 this Court held that the affairs of a corporate-debtor can contribute proximately to the trade or business of the taxpayer. There the taxpayer owned a produce business which distributed bananas. He advanced funds to a corporation which shipped bananas from Central America. He claimed that he made the advances so as to assure that his produce business would have an ample supply of bananas. The losses were held to result from a business bad debt. In Stuart Bart, 21 T.C. 880, where a business bad debt deduction was allowed, loans were made by an advertising agent to a corporate client to retain its and other business. We held that the loans were related to the taxpayer's business as an advertising agent. The facts here show a direct relationship between the incurring of the indebtedness and the conduct of the business of the petitioner. His sale of his medical equipment was part of his entering into the group practice of medicine and into the general plan adopted for that purpose. Thereafter, petitioner shared the use of the equipment with the group. When he left the group, he could not take back the equipment unless he bought it. Furthermore, it was still being used *99 by the group. The debt was at the time incurred and when it became worthless proximately and directly related to petitioner's practice of medicine, his business. The evidence compels the conclusion that the debt in question was a business bad debt. Therefore, the full amount of the loss is deductible. In H. Beale Rollins, 32 T.C. 604, affd. 276 F. 2d 368, the distinction between business bad debts and nonbusiness bad debts was discussed at length, and was considered recently in John M. Trent and Lisa M. Trent, 34 T.C. (filed August 24, 1960). Consideration has been given to these cases and other cases cited by the respondent. The rule of Ferguson, Boissevain, Koppelman, Rollins, Trent, and related cases is inapplicable here. This case resembles the Cluett, Martin, and Dorminey cases and comes within the reasoning of them. Because of certain stipulations, a Rule 50 computation is required. Decision will be entered under Rule 50. Footnotes
1. (2) Nonbusiness Debt Defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
2. 1959-2 Cum. Bul. 77, 82.↩